**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CRAIG GENESS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  16-876** |
| | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                       **November 30, 2020**

Our Court of Appeals twice agreed with our concern systemic deficiencies at the juncture of the Commonwealth's criminal justice and mental health systems played a role in intellectually impaired Craig Geness spending over nine years in custody on a 2006 homicide charge while incompetent to stand trial. Fayette County prosecutors and public defender, the Commonwealth's Department of Human Services, private lawyers, and Commonwealth judges seemingly contributed to Mr. Geness's lost liberty without a finding of guilt.  Following the December 2015 withdrawal of all charges, he seeks damages under the Americans with Disabilities Act and Fourteenth Amendment.  The issue is who may be responsible.

Following voluntary and involuntary dismissals of several persons seemingly playing a role in this breakdown, we today review whether the Commonwealth may be responsible after fulsome discovery and reviewing cross-motions for summary judgment.   We find the Commonwealth cannot invoke sovereign immunity.  While it is vicariously liable for its judges' discriminatory conduct towards Mr. Geness, it does not enjoy judicial immunity just because judges cannot be sued for discriminating against disabled persons. But we must decline entering summary judgment for Mr. Geness as a matter of law today as there are genuine issues of material fact concerning Commonwealth judges' deliberate indifference to Mr. Geness after

learning in September 2011 he would not be competent to stand trial but still keeping him in an institution under ankle monitoring. Mr. Geness remained in custody until December 2015 when the Fayette County prosecutor dismissed the charges. The state court trial judge then seemingly volunteered his view of affixing blame for the case "languishing for years" on defense lawyers. A fact finder must evaluate the credibility of this position as it relates to deliberate indifference and determine whether the Commonwealth may be responsible to Mr. Geness in damages for its role in the systemic deficiency leading to this undisputed tragedy.

## I.      Adduced facts.[1]

Ronald Fiffick suffered fatal injuries after falling down the porch steps of his assisted living facility over fourteen years ago. Paramedics arriving to the facility in November 2006 spoke to Mr. Fiffick's wife, who reported Mr. Fiffick "walked out on [the porch] and fell down approx[imately] 5 steps head first."[2] Dr. Laurie Pemberton examined Mr. Fiffick when he arrived at the hospital and noted Mr. Fiffick presented as mentally disabled, "unsteady," and "not supposed to go down the stairs."[3] There is no eyewitness testimony or medical evidence he had been pushed.

But Mr. Fiffick's daughter suspected foul play and asked the Uniontown police to investigate her father's fall.[4] Detective Jason Cox investigated and identified co-resident Craig Geness as a person of interest.[5] Mr. Geness has an IQ in the "extremely low range," schizoaffective personality disorder, and intermittent explosive disorder.[6] Detective Cox questioned Mr. Geness without an attorney present at a psychiatric hospital where Fayette County temporarily committed Mr. Geness.[7] Mr. Geness confessed to pushing Mr. Fiffick and Detective Cox arrested Mr. Geness for aggravated assault.[8] The Fayette County district attorney elevated the charges to homicide after Mr. Fiffick succumbed to his injuries.[9]

*President Judge John Wagner orders Mr. Geness's transfer to a mental health facility and a competency evaluation.*

Magisterial District Judge Blair arraigned Mr. Geness on November 20, 2006.[10] Judge Blair initially scheduled Mr. Geness's preliminary hearing for November 28, 2006, but he continued the hearing three times, eventually holding the hearing over four months later on April 3, 2007.[11] Judge Blair held the case for trial.[12]

Three months later (seven months after Mr. Geness's arrest), President Judge John Wagner of the Fayette County Court of Common Pleas held a motions hearing on June 18, 2007 and issued an order finding Mr. Geness "is not at the present time competent to stand trial; however, we do not find him to be severely mentally disabled."[13] He ordered "the Warden of the Fayette County Jail and/or Sheriff of Fayette County [to] deliver [Mr. Geness] to the State Institution at Mayview, PA for a period not to exceed sixty days."[14] He further ordered the State Institution at Mayview to "report to this Court at the expiration of sixty days as to [Mr. Geness's] capacity to stand trial and whether or not a probability exists that [Mr. Geness] will regain competency within a reasonable period of time."[15]

Despite President Judge Wagner's Order, neither the warden nor the sheriff transferred Mr. Geness to Mayview because it did not have beds available. Mr. Geness instead remained in the Fayette County Jail. On August 13, 2007, Judge Wagner issued another order, reiterating his June 18, 2007 Order in its entirety and noting space at Mayview was "now available."[16] He further ordered the Commonwealth to "have [Mr. Geness] examined by Dr. Brice Wright while [Mr. Geness] is being cared for at the State Institution in Mayview."[17] Three days later, on August 22, 2007, Public Defender Jeffrey Whiteko moved to continue all motions outstanding in Mr. Geness's case, including a habeas corpus motion, until Mr. Geness became competent.[18] Judge Ralph Warman continued the case on August 22, 2007, and directed Public Defender

3

Whiteko to "file a motion requesting hearing be rescheduled at such time as [Mr. Geness] is deemed competent to proceed."[19]

The Commonwealth then transferred Mr. Geness to Mayview in September 2007. The medical professionals at Mayview evaluated Mr. Geness.[20] They administered a "Competency Assessment for Standing Trial for Defendant with Mental Retardation" test to assess Mr. Geness's understanding of the legal system.[21] Mr. Geness scored lower than the mean for mentally handicapped individuals deemed incompetent to stand trial.[22] The medical professionals created a "Comprehensive Individualized Treatment Plan" specifically for Mr. Geness, which established the criteria Mr. Geness should meet before he should be discharged from Mayview and returned to Fayette County Jail.[23] The treatment plan included adjusting his medication, keeping him under observation, and placing him in educational groups focused on, among other things, coping and legal skills.[24] Notwithstanding this criteria, the medical professionals concluded by finding Mr. Geness "remained incompetent to stand trial" and he "will be transferred to Fayette County Jail according to security arrangements."[25] There is some evidence in the record Mr. Geness returned to the Fayette County Jail because the Mayview facility may have been closing.[26] The medical professionals did not determine whether Mr. Geness could, at some point, gain competency if he continued to undergo mental health treatment and educational training.

### All activity in Mr. Geness's case ceases while Mr. Geness remains in the Fayette County Jail until November 2010.

Nothing happened in Mr. Geness's case between August 2007 and November 2010. Public Defender Whiteko did not make a single motion on Mr. Geness's behalf during these thirty-nine months and the docket does not reflect activity between August 22, 2007 and November 17, 2010.[27]

While Mr. Geness's case stagnated, the Court of Common Pleas held a monthly "Call of the Criminal Trial List." From the transcripts of these proceedings, it appears the district attorney, the defense attorneys, and the presiding judge would discuss pending cases and determine which cases would be trial ready in the upcoming month.[28] On a given month, the list of pending criminal cases contained between 180 and 250 active defendants, many of whom had been deemed incompetent to stand trial.[29] It appears the parties would not discuss each case on the list every month, but rather the district attorney would call the judge's attention to a handful of specific cases, and the defense attorneys would provide additional context for the cases as necessary.[30] The parties often skipped over entire pages of the list.[31]

The adduced evidence includes transcripts from fourteen call of the list proceedings between August 2007 and November 2010. The transcripts do not mention Mr. Geness.[32]

### Public Defender Whiteko, Judge Wagner, and Judge Solomon attempt to have Mr. Geness transferred to Torrance and evaluated for competency.

After three years of inactivity, Public Defender Whiteko filed a flurry of motions on November 17, 2010, including: a petition for involuntary commitment; a motion for residential treatment; and a motion for a release to Mr. Geness's own recognizance bond (an "ROR bond").[33] Mr. Geness's name appears for the first time on the transcript for the Call of the Criminal Trial List held on November 20, 2010 with Judge Leskinen presiding.  District Attorney Heneks notified the Court Mr. Geness and two other defendants on the first page of the list were incompetent to stand trial.[34]  The transcript does not show what happened next, but rather goes "off the record" and says "at this time, the above titled matter was concluded."[35] A few days later, Public Defender Whiteko also moved to continue Mr. Geness's case until he is found competent.[36]  Judge Wagner scheduled a hearing for the petition for involuntary commitment for November 29, 2010.[37]

After the hearing, Judge Wagner issued an order denying the motion for an ROR bond, the petition for involuntary commitment, and treatment pending the results of the evaluation.[38] He further ordered "the Warden of the Fayette Co. Prison and/or the Sheriff of Fayette County [to] deliver [Mr. Geness] to the State Institution at Torrance, PA, for a period not to exceed ninety (90) days or any other relevant statutory period."[39] He ordered the transfer for two purposes:  (1) to "determine [Mr. Geness's] capacity to stand trial at the present time; and (2) to determine whether or not a probability exists that [Mr. Geness] will regain competency within a reasonable period of time."[40] Judge Wagner further ordered "upon motion of counsel, the Court will schedule an additional hearing" and "[s]hould an additional hearing be necessary, the Commonwealth may have [Mr. Geness] examined by Dr. Bruce Wright, or any other appropriate individual, while in the care of the SI or upon his return to the Fayette Co. Prison, but in a timely fashion so as to not delay a hearing on the ultimate issue."[41]

Despite Judge Wagner's Order, neither the warden nor the sheriff could transfer Mr. Geness to Torrance State Hospital because Torrance refused to admit him, citing a lack of available beds.[42] As Torrance did not accept him, Mr. Geness did not undergo the competency evaluation ordered by Judge Wagner.[43]

On July 25, 2011, approximately six months after Judge Wagner's Order, Public Defender Whiteko moved to set bail for an release bond. Court of Common Pleas Judge Gerald R. Solomon held a hearing on Public Defender Whiteko's motion for the bond on August 17, 2011. Public Defender Whiteko, counsel for the Commonwealth, and Judge Solomon all agreed the situation with Mr. Geness was unacceptable and they needed to do something about it. Judge Solomon remarked, "Something needs to be done, this situation cannot continue to exist."[44] But the parties were at a loss as to what they could do given: (1) the Torrance facility

refused to accept Mr. Geness despite Judge Wagner's Order; (2) neither the court nor the parties had yet received an evaluation definitively saying Mr. Geness would never be competent to stand trial; and (3) the Commonwealth believed Mr. Geness could pose a danger to society if released on his own recognizance.[45]

Public Defender Whiteko and Judge Solomon appeared to agree Torrance would be the "best place" for Mr. Geness[46] because, if the medical professionals at Torrance deemed him incompetent, the facility could commit Mr. Geness for appropriate mental health treatment until he became competent.[47] Having reached this understanding, Judge Solomon told the parties, "[m]y inclination at this point is entering an order directing that [Mr. Geness] be taken to Torrance and further Order that Torrance is to receive him and do an evaluation and if he continues to be incompetent to stand trial, then commit for him for appropriate treatment until he becomes competent."[48] Judge Solomon further told the parties, "I don't know what affect [sic] it will have, but I will enter the order."[49] Public Defender Whiteko told Judge Solomon he "appreciate[d] that" and added, "[w]e have to do something."[50] At no point during the hearing did Public Defender Whiteko argue Mr. Geness should be released because he would never be competent to stand trial, nor did he argue the Commonwealth had insufficient evidence to sustain homicide charges against Mr. Geness.

Judge Solomon then denied the public defender's motion for a release bond without prejudice and ordered Mr. Geness "be delivered to SCI Torrance."[51] Judge Solomon further ordered, "should it be determined that [Mr. Geness] is not competent to function in society, he shall be admitted to the State Institution of Torrance for appropriate treatment."[52] A week later, Judge Solomon amended his Order "to reflect that, at the direction of the State Institution at Torrance, PA, the determinations to be made as to . . . Craig A. Geness, may be made at the

Fayette Co. Prison."[53] It appears Judge Solomon amended his Order because Torrance told him it did not have enough beds to accept Mr. Geness, and it would be more expeditious to send their professionals to the Fayette County Jail for evaluation.[54]

> ### *Dr. Chaudhary determines Mr. Geness will probably never become competent, and Judge Wagner orders Mr. Geness committed to Long Term Structured Release.*

Dr. Safdar I. Chaudhary evaluated Mr. Geness at the Fayette County Jail citing Judge Solomon's Order as the reason for the assessment.[55] On September 4, 2011, Dr. Chaudhary found Mr. Geness incompetent to stand trial and "not likely to regain competency in the foreseeable future."[56] He further found Mr. Geness "not likely to benefit from any additional psychiatric interventions that will restore him to a high level of functioning."[57]

Twenty-one days after Dr. Chaudhary completed his assessment, Judge Wagner declared Mr. Geness incompetent to stand trial and directed Mr. Geness be involuntarily committed to Long Term Structured Release through Chestnut Ridge Counseling Services, Inc., "there to remain without contact with the general public, under the supervision of Clinton Anderson, to be returned to the Fayette County Jail upon completion of his therapeutic program or a determination that he is competent to stand trial, whichever comes first."[58] Chestnut Ridge Counseling Services' website advertises its purpose is to "allow[] you to transition back into the community with the support and skills necessary to be successful in your recovery journey."[59]

Mr. Geness wore an ankle monitor at Chestnut Ridge.[60] It is not clear who decided Mr. Geness would wear an ankle monitor as Judge Wagner's Order is silent as to ankle monitoring.

Following Judge Wagner's September 21, 2011 order declaring Mr. Geness incompetent to stand trial, Mr. Geness's name appears on the transcripts of the call of the list proceedings three times in late 2011 and early 2012 after Judge Wagner transferred Mr. Geness to Long Term

Structured Release: (1) on October 31, 2011 with Judge Leskinen presiding;[61] (2) on November 28, 2011 with Judge Vernon presiding;[62] and (3) on January 30, 2012 with Judge Warman presiding.[63]   All three times, District Attorney Heneks mentioned Mr. Geness and two other Defendants were awaiting competency proceedings or had been declared incompetent and the transcript went off the record immediately.[64]   There is no evidence of steps taken by the judges, prosecutor, or defense lawyer to get a better understanding of Mr. Geness's status.

### *Attorney Tummons takes over Mr. Geness's defense.*

In 2012, Mental Health Program Manager Anderson contacted Ms. Bernadette Tummons,[65] a private defense attorney who had previously worked in the public defender's office,[66] and asked her to investigate Mr. Geness's case. Attorney Tummons decided to take over Mr. Geness's case *pro bono*[67] and entered her appearance in March 2012.[68] Attorney Tummons obtained a court order requiring Public Defender Whiteko to give her Mr. Geness's file.[69] The file contained only publicly-filed court documents.[70] It did not contain Mr. Geness's jail records, medical records from Mr. Geness or Mr. Fiffick, or discovery material.[71] Public Defender Whiteko told Attorney Tummons Mr. Geness's jail records had been "destroyed."[72]   Attorney Tummons also requested discovery from District Attorney Heneks beginning in August 2012. Attorney Tummons "called Mr. Heneks's office approximately six (6) times to request discovery" and "visited Mr. Heneks's office approximately 6 times to request discovery."[73] District Attorney Heneks did not produce any of the requested discovery until June 18, 2014.[74]

District Attorney Heneks repeatedly failed to turn over discovery. Attorney Tummons moved to dismiss, sought a writ of habeas corpus, and filed an omnibus pre-trial motion on May 13, 2015.[75]   Nine days later, Judge Leskinen scheduled a competency hearing for July 15, 2015.[76]   Attorney Tummons then moved to compel discovery after District Attorney Heneks

stonewalled her for three years.[77] Judge Wagner granted her motion less than two weeks after she filed it. Attorney Tummons had all relevant discovery materials by the end of the May 2015.[78]

Meanwhile, as Attorney Tummons sought discovery from District Attorney Heneks, the judges of the Court of Common Pleas continued presiding over the Call of the Criminal Trial List each month.  From August 2012 to July 2014, Mr. Geness's name appears on the Call of the Criminal Trial List transcripts three times:  (1) on August 27, 2012 with Judge Capuzzi presiding;[79] (2) on May 28, 2013 with Judge Wagner presiding;[80] and (3) July 28, 2014 with Judge Wagner presiding.[81]  On August 27, 2012, District Attorney Heneks states Mr. Geness and three other defendants are "accounted for" and the transcripts go "off the record."[82]  On May 28, 2013, District Attorney Heneks mentions Mr. Geness and another defendant are not competent, and again the transcript goes off the record.[83]  On July 28, 2014, the district attorney states Mr. Geness and several others are not competent and the proceedings go off the record.[84]  The parties do not adduce evidence of these regrettable "off the record" decisions affecting Mr. Geness's liberty after the judges know he will never be competent for trial and they continue to hold him in custody.

Transcripts of the Call of the Criminal Trial List proceedings reveal the judges and attorneys often faced difficult procedural questions regarding what to do with defendants deemed incompetent to stand trial including after Attorney Tummons began representing Mr. Geness. For example, during the August 2013 call of the list, Judge Wagner learned a different incompetent defendant was incarcerated at the Fayette County Jail, awaiting trial. Judge Wagner said the jail was "the worst place" the defendant "could be right now" and asked the attorneys, "[s]o why aren't we at least getting him to Torrance, and then work out whatever you want to work out?" [85]

When the attorneys explained there was a hold up at the Attorney General's office, Judge Wagner replied, "[b]ut he shouldn't be [at the Fayette County Jail] where he gets no services whatsoever" and continued "why can't we simply do an order and have him transferred to Torrance, and whatever you and the AG want to do after that I could care less . . ."[86]  The defense attorney and district attorney alike told Judge Wagner there was nothing he could do without Attorney General's consent.[87]

### *Judge Leskinen determines Mr. Geness will never be competent to stand trial and District Attorney Heneks withdraws the criminal charges.*

At the July 15, 2015 competency hearing, licensed psychotherapist Dr. Scott Tracy testified as to Mr. Geness's competency and his ability to give a voluntary confession.[88] Dr. Tracy evaluated Mr. Geness in June 2015 and reviewed his earlier competency evaluations.[89] Dr. Tracy concluded Mr. Geness would never be able to live independently and will likely need to live under supervision in a group home for people with disabilities for the rest of his life.[90] Attorney Tummons asked Dr. Tracy if Mr. Geness had ever been, or would ever be, able to participate in his defense.[91] Dr. Tracy testified he did not believe Mr. Geness would ever be able to participate in his defense.[92] Attorney Tummons went further, asking "is there any possibility in the normal course of living and treatment and medicine and counseling that he would ever be restored to a mental capacity that would allow him to assist in his defense in this criminal case?"[93] Dr. Tracy responded, "barring a miracle drug," treatment and counseling would not likely work on Mr. Geness.[94] Dr. Tracy further testified Mr. Geness would pose a danger to society if released from Chestnut Ridge.[95]

Dr. Tracy also testified as to Mr. Geness's "confession" leading to his arrest almost nine years earlier. Dr. Tracy explained Mr. Geness is highly susceptible to suggestion.[96] Mr. Geness does not initiate conversation, but rather "respond[s] back" to what he "receiv[es] in."[97] For

example, Dr. Tracy suggested the weather was nice on the day of the evaluation, and Mr. Geness agreed with him even though the weather was not.[98] He explained, like others with a similar IQ range, Mr. Geness is "agreeable when prompted."[99]

Judge Leskinen stated, "I take it at this point there really is no contest to finding by the Court that the defendant remains incompetent and to the extent that I am permitted to find that he is incompetent, it appears likely that he will remain incompetent for the duration of his life."[100] Judge Leskinen then posited whether a Pennsylvania statute required periodic review of this ruling, and Attorney Tummons informed him the Mental Health Act gives the court discretion and offered to provide a copy to the court. [101] Judge Leskinen told Attorney Tummons to ask for the order she wanted and provide the authority saying the court could enter the order requested.[102]

District Attorney Heneks then stated, "I would like to explore the resolution of the criminal charges . . . the nature of the incident and the competency and the mental state of the defendant would make it difficult for the Commonwealth to proceed even if he were competent."[103] Judge Leskinen told the parties to file a joint motion or reach an agreement within thirty days dealing with all remaining issues in Mr. Geness's case, including the disposition of the criminal charges, Mr. Geness's living arrangements, and the discontinuation of ankle monitoring.[104] Judge Leskinen asked District Attorney Heneks whether thirty days would provide sufficient time to consult with Mr. Fiffick's family; District Attorney Heneks confirmed it would be sufficient.[105] The parties disputed whether the court had authority to grant a habeas petition of an incompetent defendant, but neither party was "ready to present evidence on" the habeas issue.[106] Attorney Tummons told Judge Leskinen she would reserve the habeas issue "for

another day."[107]   There is no record of the parties filing the joint motion within thirty days as ordered by Judge Leskinen.

Attorney Tummons renewed her motion to dismiss, her habeas motion and her omnibus pre-trial motions on September 9, 2015, and within a week Judge Leskinen scheduled a hearing for over two months later, November 10, 2015.[108]

Before the hearing, District Attorney Heneks provided an update on Mr. Geness's case during the monthly Call of the Criminal Trial List on October 24, 2015 with Judge Wagner presiding.  District Heneks said, "[n]ext is Craig Geness and that will be resolved.  There's going to be a guardianship appointed and once that's done we will move to dismiss those charges."[109]

On November 25, 2015, Judge Leskinen held another hearing.[110]  District Attorney Heneks disclosed he planned to *nolle prosequi* the charges against Mr. Geness, have a guardian appointed, and have the guardian civilly commit Mr. Geness.[111]  He explained he spoke with Mr. Fiffick's daughter, and she agreed the Commonwealth should not proceed with Mr. Geness's case.[112]  He visited Mr. Geness and arranged for his relocation to another residential facility through the Department of Public Welfare.[113]  He told Judge Leskinen he worked with the Behavioral Health Administration to make guardianship arrangements for Mr. Geness given his lack of family.[114]

Attorney Tummons objected to this plan, arguing Judge Leskinen should grant her habeas petition rather than allowing District Attorney Heneks to *nol pros* the charges because the Commonwealth had no evidence against Mr. Geness.[115]  Judge Leskinen did not see the harm in allowing the Commonwealth to *nol pros* the charges, and indicated he planned to grant the *nol pros* petition and moot the habeas petition.[116]  On the November 30, 2015 Call of the Criminal

Trial List with Judge Wagner presiding, District Attorney Heneks stated he had "presented [Mr. Geness] for nol pros."[117]

On December 10, 2015, Judge Leskinen approved the Commonwealth's request for leave to enter a *nol pros* and dismissed the charges against Mr. Geness without prejudice.[118]  Judge Leskinen found Mr. Geness "remains incompetent to stand trial, and has been incompetent since approximately the time he was first referred for evaluation & treatment."[119] Judge Leskinen continued, "[a]lthough the defense has recently been pursuing a dismissal aggressively, this matter languished for years while [Mr. Geness] was being evaluated for competency . . . [a]ll delay is attributable to the defense."[120]

### *Mr. Geness brings this case.*

On June 17, 2016, Mr. Geness sued the City of Uniontown, Fayette County, Detective Cox, and the owners of Mr. Geness's assisted living facility.[121] He brought federal claims under the Americans with Disabilities Act,[122] the Fourteenth Amendment, and the Fourth Amendment. His Fourteenth Amendment claims included malicious prosecution, false arrest, false imprisonment, reckless investigation, and a violation of his right to equal protection as a disabled person.[123]  He also brought a state law claim for intentional infliction of emotional distress.

Detective Cox and the City of Uniontown moved to dismiss.[124] Mr. Geness withdrew his claims against Uniontown during oral argument, and we dismissed Uniontown.[125] Detective Cox answered Mr. Geness's complaint, denying all claims and asserting affirmative defenses.[126] Mr. Geness's counsel withdrew his claim against Fayette County before it responded to the allegations.[127] On February 10, 2017, we referred the case to mediation.[128] The parties did not resolve the case.[129]

### Mr. Geness seeks to add the Commonwealth as a Defendant.

On March 1, 2017, Mr. Geness voluntarily dismissed the owners of the assisted living facility, leaving only Detective Cox as a defendant.[130] Mr. Geness sought leave to amend his complaint to add an Americans with Disabilities Act claim against the Commonwealth.[131] We denied Mr. Geness leave to amend, determining Mr. Geness's motion to be both unduly delayed and futile.[132] We reasoned Mr. Geness's amendment would be futile because he sought to hold the Commonwealth liable for the decisions of individual Pennsylvania judges, and the *Rooker-Feldman* doctrine barred us from second guessing the state court judges' rulings.[133] Mr. Geness filed his amended complaint naming only Detective Cox.[134] We granted Detective Cox's motion for summary judgment and closed the case.[135] Mr. Geness appealed.[136] He sought to reverse our dismissal of the civil rights claims and reverse our decision denying him leave to amend to add the Commonwealth as a defendant on the disabilities claim.

### Geness v. Cox ("Geness I").[137]

Our Court of Appeals affirmed our dismissal of Mr. Geness's civil rights and malicious prosecution claims, but reversed our denial of Mr. Geness's request to amend.[138] The Court of Appeals held Mr. Geness's proposed amendment, adding an Americans with Disabilities Act claim against the Commonwealth, would not be futile.[139] It remanded to allow Mr. Geness to "reinstate his claims against the Commonwealth."[140]

In determining Mr. Geness's amendment would not be futile, our Court of Appeals explained Mr. Geness must plead four elements to state a claim under Title II of the Americans with Disabilities Act against the Commonwealth: "(1) he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity;

(4) by reason of his disability."[141] The Court of Appeals found Mr. Geness satisfied all four elements and focused its analysis on the third and fourth elements. The Court of Appeals reasoned the Commonwealth had the following responsibilities:

- to "ensure inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals";

- not to "place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available";

- to timely transfer a detainee in need of a mental health evaluation to a mental health facility;

- not to subject a detainee to involuntary competency restoration treatment for an unreasonable period of time.[142]

The Court of Appeals held Mr. Geness adequately pleaded the Commonwealth failed to carry out these responsibilities, and these alleged failures deprived Mr. Geness of the benefits of procedural safeguards designed to protect him.[143] The Court of Appeals held Mr. Geness adequately pleaded a Title II claim.[144] The Court of Appeals further held "[t]hese same circumstances are also sufficient to sustain Geness's claim that he was 'deprived . . . of normal benefits of criminal procedure and due process of law . . . both as to his protracted incarceration without prompt transfer to a mental health facility, and his protracted institutionalization without a realistic prospect of trial."[145]

*Geness v. Administrative Office of Pennsylvania Court ("Geness II").* [146]

Mr. Geness filed an amended Complaint on October 8, 2018 against the Administrative Office of Pennsylvania Court (the "AOPC") and the Commonwealth.[147] Six months later, we allowed Mr. Geness to amend his complaint to add the Pennsylvania Department of Human Services ("DHS").[148]

The AOPC moved to dismiss the Title II and Fourteenth Amendment claims against it, arguing it had immunity under the Eleventh Amendment.[149] We held Mr. Geness adequately pleaded his Title II and Fourteenth Amendment claims and the Eleventh Amendment did not shield the AOPC from suit.[150] We also held the AOPC could not invoke quasi-judicial immunity because the AOPC is an entity, and only individuals being sued in their individual capacity can invoke absolute immunity.[151] The AOPC appealed our ruling on sovereign immunity, but not our ruling on judicial immunity. Our Court of Appeals reversed our ruling on sovereign immunity and did not directly address our ruling on judicial immunity.

Applying the *United States v. Georgia*[152] analysis, which requires courts to examine whether the AOPC's conduct violated Title II as a threshold inquiry to whether the Eleventh Amendment applies, our Court of Appeals determined Mr. Geness did not adequately plead a Title II claim against the AOPC and therefore, the AOPC could invoke sovereign immunity.[153] To plead a Title II claim, the Court of Appeals explained Mr. Geness must allege he "was excluded from participation in or denied the benefits of services, programs, or activities of a public entity, or was subject to discrimination by any such public entity."[154] Satisfying this element of a Title II claim requires identifying specific "services, programs, or activities of a public entity."[155] Our Court of Appeals interpreted Mr. Geness's allegations as pleading two potential "services, programs or activities":  (1) the AOPC's duty to "intervene directly with the

Fayette County Court to ensure the Plaintiff's case moved forward," and (2) its duty to "seek intervention for such result by the Pennsylvania Supreme Court."[156]

Regarding the AOPC's duty to intervene directly in his case, the Court of Appeals noted Mr. Geness did not specify precisely which actions the AOPC could have taken to move his case along beyond inquiring about his case, which the AOPC did repeatedly.[157] The Court concluded "[t]hus, Geness's allegation of AOPC's failure to directly intervene with the county court in some unspecified manner, beyond its repeated inquiries to the court administrator, cannot sustain his claim under Title II of the ADA."[158]

The Court of Appeals then addressed the AOPC's duty to ask the Pennsylvania Supreme Court to intervene in Mr. Geness's case.[159] Our Court of Appeals reasoned Mr. Geness's view of this duty to intervene would require the AOPC to "closely monitor, deeply evaluate, and consider intervening in every criminal case pending in the Commonwealth."[160] In essence, it would require the AOPC to meddle in judicial decision-making, which our Court of Appeals determined the AOPC has no duty or power to do.[161] It further reasoned even if the AOPC did have a duty to seek intervention from the Pennsylvania Supreme Court, Mr. Geness does not plead it failed to do so "by reason of his disability."[162] Our Court of Appeals thus concluded Mr. Geness failed to satisfy the *Georgia* elements and ordered us to dismiss the claims against the AOPC.[163]

Mr. Geness petitioned for *en banc* review of the Court of Appeals' *Geness II* decision on September 22, 2020,[164] which the Court of Appeals denied on October 29, 2020.[165]

Before the Court of Appeals ruled on the AOPC's appeal, the Commonwealth and Mr. Geness cross-moved for summary judgment. We stayed the cross-motions during the pendency of the AOPC appeal. After the Court of Appeals issued *Geness II*, we granted the

parties leave to file supplemental briefing on their cross-motions possibly addressing the Court of Appeals' opinion.[166]

### *The DHS settles the claims against it and obtains a release.*

While the Court of Appeals considered the AOPC's appeal, the DHS and Mr. Geness agreed the DHS would pay Mr. Geness $375,000 in exchange for Mr. Geness' release of the DHS.[167] We approved the settlement agreement on July 14, 2020 after finding Mr. Geness's counsel's supplemental materials and the newly appointed guardian ad litem's opinion credible and persuasive.[168] We dismissed the DHS two weeks later after confirming payment logistics.[169]

## II.   Analysis

After voluntarily dismissing Fayette County (employer of the prosecutor and public defender) before it responded to the Complaint and releasing the DHS in exchange for consideration we found to be fair, Mr. Geness is now left with two claims against the Commonwealth: (1) acting through the AOPC, the Fayette County Court of Common Pleas and numerous judges, violated his rights under Title II of the Americans with Disabilities Act and the Fourteenth Amendment; and, (2) acting through the DHS, violated his rights under Title II of the Americans with Disabilities Act and the Fourteenth Amendment.

In reversing our first denial of potential claims against the Commonwealth, our Court of Appeals shared our concern with a systemic breakdown in the Commonwealth's criminal justice and mental health systems. But it reached this observation based on allegations. We have the benefit today of a fulsome record to examine whether Mr. Geness adduced evidence warranting judgment against the Commonwealth either today or after the fact-finder considers genuinely disputed issues of material fact.

The Commonwealth initially sought summary judgment on two grounds: (1) the Eleventh Amendment bars Mr. Geness's Fourteenth Amendment Due Process Claims; and (2) Mr. Geness cannot establish a claim under Title II of the Americans with Disabilities Act because he cannot establish the Commonwealth acted with deliberate indifference to his rights.[170] In its supplemental memorandum following *Geness II*, the Commonwealth argued Mr. Geness "cannot establish a basis for liability against the Commonwealth independent and apart from his claims against the other defendants in this action . . . [a]nd now that those claims have been definitively resolved with respect to those other defendants, nothing remains to establish or support liability against the Commonwealth."[171]

Mr. Geness argued in his initial (pre-*Geness II*) motion (1) he did not seek to assert a standalone Fourteenth Amendment claim; and (2) he adduced sufficient evidence to establish the Commonwealth violated Title II of the Americans with Disabilities Act.[172] In his supplemental briefing, Mr. Geness argued the Court of Appeals' ruling in *Geness I* and subsequent affirmation of the binding nature of *Geness I* in *Geness II* makes clear the Commonwealth cannot invoke sovereign immunity.[173]

We held oral argument on the parties' cross-motions for summary judgment to clarify the issues after *Geness II*.[174] Oral argument clarified the issues as whether: (1) the Commonwealth can be held liable for the conduct of the Court of Common Pleas judges; (2) the Commonwealth can invoke sovereign or judicial immunity; and (3) Mr. Geness established deliberate indifference as a matter of law subject to a damages determination by the fact-finder.

**A.      We grant the Commonwealth's motion for summary judgment in part and deny in part.**

The Commonwealth argues Mr. Geness cannot proceed against it as a matter of law because "nothing remains to establish or support liability against the Commonwealth" following

our dismissal of the claims against the AOPC and the DHS.[175] We agree we must dismiss claims against the Commonwealth to the extent they are predicated entirely on the claims against the AOPC and the DHS. But dismissing these claims would not dispose of the Commonwealth's potential liability altogether. The Commonwealth overlooks Mr. Geness's allegations regarding the judges of the Fayette County Court of Common Pleas, one of the cogs in the systemic breakdown recognized by our Court of Appeals in *Geness I*.

###### 1. We grant the Commonwealth's motion for summary judgment as to DHS's obligations.

We grant the Commonwealth's motion for summary judgment as to DHS's conduct because Mr. Geness concedes his settlement with the DHS released the Commonwealth from liability for this claim.[176] In light of Mr. Geness's concession, we grant the Commonwealth's motion dismissing claims relating to DHS's direct obligations.[177]

At oral argument, Mr. Geness explained the DHS is the party responsible for the first two of the four "services" our Court of Appeals identified in *Geness I*: "ensur[ing] inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals"; and not "plac[ing] inmates or detainees with disabilities in appropriate security classifications because no accessible cells or beds are available."[178] In releasing the Commonwealth for liability for claims based on the DHS's conduct, Mr. Geness released the Commonwealth for liability stemming from the repeated failures of Torrance and Mayview to admit Mr. Geness and conduct a competency evaluation when ordered to do so.

###### 2. We grant in part and deny in part the Commonwealth's motion for summary judgment based solely on AOPC's conduct.

As our Court of Appeals instructed in *Geness II*, Congress has not validly abrogated the Commonwealth's sovereign immunity for claims based on the AOPC's conduct.[179] We grant summary judgment to the Commonwealth on claims predicated solely on the AOPC's conduct.

But this does not end our inquiry. We must assess whether the Commonwealth can be held liable based on the conduct of the Court of Common Pleas judges. To determine whether to grant the Commonwealth's motion for summary judgment, we must assess whether: (1) Congress validly abrogated the Commonwealth's sovereign immunity for Americans with Disabilities Act claims based on the judges' conduct; (2) the Commonwealth can be held vicariously liable for the conduct of its judges;[180] and (3) the Commonwealth can invoke judicial immunity.

### i. The Commonwealth is not entitled to sovereign immunity for Mr. Geness's Americans with Disabilities Act claims.

Under *Geness I*, the Commonwealth cannot invoke sovereign immunity against Mr. Geness's Americans with Disabilities Act claims based on the conduct of the Court of Common Pleas judges. "To determine whether Congress validly abrogated sovereign immunity for [Mr.] Geness's Title II and Fourteenth Amendment claim against [the Commonwealth], we must apply the three-part *Georgia* test."[181] Under *Georgia*, we must assess: "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such conduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that conduct is nevertheless valid."[182]

To assess the first prong of the *Georgia* test, we must determine if the Commonwealth, acting through its judges, violated Title II. To establish the Commonwealth violated Title II, Mr. Geness must prove: "(1) he is a qualified individual; (2) with a disability; (3) who was

excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability."[183]  The Commonwealth does not dispute Mr. Geness is a qualified individual with a disability.[184]  The question before us now is whether the Commonwealth "excluded [him] from participation in or denied [him] the benefits of the services, programs, or activities of a public entity, or . . . subjected [him] to discrimination . . . by reason of his disability."[185]

Our Court of Appeals in *Geness I* determined the following responsibilities consisted of "services" under Title II:  (1) "ensur[ing] that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals"; (2) not "plac[ing] inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available"; (3) transferring a detainee in need of inpatient examination to a mental health facility; and (4) limiting involuntary competency restoration to a reasonable period of time.[186] While Mr. Geness concedes the DHS is responsible for the first and for the second of the "services" identified by our Court of Appeals, he argues the Court of Common Pleas judges are seemingly responsible for the third and fourth "services." Our Court of Appeals in *Geness I* further found Mr. Geness adequately pleaded the Commonwealth denied him these services "by reason of his disability."[187] Mr. Geness does not offer other "services" for our consideration.

Our Court of Appeals and our earlier decisions did not have the benefit of a developed record. We must assess whether the record establishes the Commonwealth deprived Mr. Geness of these services by reason of his disability. We find the Commonwealth, acting through its judges, did not deprive Mr. Geness of the Commonwealth's services on account of his disability by failing to transfer him, but did violate his rights by failing to limit his competency restoration to a reasonable period of time.

23

With respect to the failure to transfer Mr. Geness from the Fayette County Jail to a mental health facility, the record establishes the judges repeatedly tried to have Mr. Geness transferred to a mental health facility, and each time, the mental health facilities refused to accept him because the DHS failed to allocate sufficient beds. We have no evidence the Commonwealth, *acting through its judges*, violated the Americans with Disabilities Act because Torrance and Mayview refused to comply with the judges' orders. While Mr. Geness adduced evidence the DHS likely violated his rights when the Commonwealth held him in prison, rather than a mental health facility, Mr. Geness already released the appropriate party, the DHS, for this failure to be transferred and he conceded the Commonwealth has been released for claims arising from the DHS's conduct. He offers no evidence the Commonwealth had some separate connection to this claim.

We find a different fact pattern as to the identified "service" of avoiding protracted involuntary restoration treatment. Dr. Chaudhary told the judges Mr. Geness would never become competent in 2011. Despite presumably knowing Dr. Chaudhary's undisputed opinion, Judge Wagner ordered Mr. Geness transferred to Long Term Structured Release without outside contact until he either became competent or completed a program. Upon either event, Judge Wagner required the Commonwealth return Mr. Geness to Fayette County Jail. Judge Wagner did not set a date for review, despite the fact the attorneys had demonstrated they could not be trusted to timely seek relief for Mr. Geness. Had Mental Health Program Administrator Anderson never contacted Attorney Tummons and asked her to take on Mr. Geness's case, we query whether Mr. Geness would still be in Long Term Structured Release wearing an ankle monitor. As the facts regarding Judge Wagner's commitment of Mr. Geness to Long Term Structured Release are not in dispute, we find Mr. Geness established the Commonwealth's

conduct violated Title II as a matter of law under *Geness I*.  He satisfies the first prong of the *Georgia* test.

To assess the second prong of the *Georgia* test, we must determine the extent to which the alleged conduct also violates the Fourteenth Amendment. Again our Court of Appeals addressed this issue in *Geness I*, finding, "[t]hese same circumstances are also sufficient to sustain Geness's claim that he was 'deprived . . . of the normal benefits of criminal procedure and due process of law . . . both as to his protracted incarceration without prompt transfer to a mental health facility, and his protracted institutionalization without a realistic prospect of trial."[188] As discussed above, Judge Wagner played a critical role in Mr. Geness's protracted institutionalization by ordering Mr. Geness to Long Term Structured Release for competency restoration treatment despite having received a report Mr. Geness would never become competent.

As the alleged conduct "actually violates" the Fourteenth Amendment, we need not assess the third prong of the *Georgia* test to find the Commonwealth cannot invoke sovereign immunity.

Having satisfied the *Georgia* test, Mr. Geness has shown the Commonwealth cannot invoke sovereign immunity.

### 3. The Commonwealth may be vicariously liable for the judges' conduct.

The Commonwealth argues we cannot hold it liable for the conduct of its judges in institutionalizing Mr. Geness for an undefined period in 2011 after learning Mr. Geness would never become competent to stand trial because the Americans with Disabilities Act does not provide for vicarious liability.[189] We disagree.

The Supreme Court recently declined to weigh in on the issue of whether a public "entity can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees" under Title II of the Americans with Disabilities Act,[190] and our Court of Appeals has never addressed the issue. But every district court judge in our Circuit confronted with this question has determined public entities are vicariously liable for the conduct of their employees under Title II of the Americans with Disabilities Act.[191] At least two judges have held, "Title II of the ADA . . . provide[s] for vicarious liability and do[es] not permit liability for individuals."[192] This reasoning in our Circuit is in accord with the reasoning from courts of appeals in other circuits. The Court of Appeals for the Ninth Circuit has held, "[w]hen a plaintiff brings a direct suit under . . . Title II of the ADA against a municipality (including a county), the public entity is liable for the vicarious acts of its employees."[193] The Court of Appeals for the Fifth Circuit has also held, "when a plaintiff asserts a cause of action against an employer-municipality, under either the ADA or the RA, the public entity is liable for the vicarious acts of any of its employees."[194]

Some courts have applied a different standard finding we may not hold a public entity liable under a strict *respondeat superior* theory, but may hold an entity liable under the standard set forth in *Gebser v. Lago Vista Independent School District*.[195] In *Gebser*, the Supreme Court addressed when a court may hold a school district liable under Title IX for a teacher's abuse of a student.[196] The Court held, "in cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at minimum has authority to address the alleged discrimination and to institute corrective measures . . . has authority to address the alleged discrimination and institute corrective measures

on the [entity's] behalf has actual knowledge of discrimination in the [entity's] programs and fails to adequately respond."[197]

We need not decide which approach is correct because under either a *respondeat superior* theory or under *Gebser*, we may hold the Commonwealth liable for the conduct of the Court of Common Pleas judges under the Americans with Disabilities Act. The Commonwealth concedes the individual judges and the Court of Common Pleas as a whole are "instrumental[ities] of the Commonwealth."[198] The record establishes the judges "had actual knowledge of" at least some of the "discrimination in the entity's programs" and "ha[d] authority to address the alleged discrimination and institute corrective measures on the [Commonwealth's] behalf."[199] When medical professionals first determined Mr. Geness would never be competent for trial in 2011, Judge Wagner transferred him to Long Term Structured Release. Judge Leskinen ultimately corrected this decision. If the judges are found to have been deliberately indifferent to Mr. Geness's rights under the Americans with Disabilities Act, the Commonwealth may be held vicariously liable for the judges' conduct.

### 4.    The Commonwealth cannot invoke judicial immunity.

The Commonwealth cannot invoke judicial immunity because the Commonwealth is an entity, not an individual. We held in our May 28, 2019 Memorandum an entity, like the Commonwealth, cannot invoke judicial immunity because judicial immunity protects only individuals acting in their individual capacities.[200] The law of the case doctrine counsels we refrain from revisiting this holding unless we discover new evidence, the law changes, or we find our earlier ruling clearly erroneous.[201]

The Commonwealth argues we should revisit our holding on judicial immunity because our Court of Appeals implicitly overruled it in footnote 12 of *Geness II*.  Mr. Geness disagrees,

arguing footnote 12 applies only to the AOPC and does not apply to the Commonwealth. He further argues *Geness I* directs the Commonwealth's liability may be premised on judicial conduct.  Our Court of Appeals noted in *Geness II*:

> Geness's Second Amended Complaint also links AOPC's alleged wrongdoing to the conduct of judges in their disposition of his case. *See, e.g.*, App. 43 ¶ 52 ("The above-described Judges continued to permit Plaintiff's case to be listed for trial, despite their actual knowledge of his incompetency."). Allegations of wrongdoing based on judicial conduct are omitted here because AOPC's administrative functions and the independent role of the judiciary must not be conflated. *See Figueroa v. Blackburn*, 208 F.3d 435, 440 (3d Cir. 2000) ("The doctrine of judicial immunity is founded upon the premise that a judge, in performing his or her judicial duties, should be free to act upon his or her convictions without threat of suit for damages."). The parties do not present and we are not aware of any legal authority that would permit AOPC to be found liable based on judicial conduct. Further, Geness acknowledges that AOPC cannot be held liable based on judges' decision-making. Appellee's Br. 25 ("The AOPC does not have oversight over criminal cases and the decisions that are required in each such case to the extent that those are duties to be performed by the Judges of the Common Pleas Court . . . . AOPC does in fact have the duty to oversee the actions of those Judges to ensure that, among other things, the courts comply with the rights of disabled individuals.").[202]

We do not read this footnote, or any other language in *Geness II*, as overruling our holding on judicial immunity. We read the footnote as focusing on whether the AOPC may be held liable for judicial decision-making and not addressing whether the Commonwealth may be held liable for judicial decision-making under the Americans with Disabilities Act. Our Court of Appeals focused on Mr. Geness's concession the AOPC had no power over judges' decision-making. The Commonwealth, by contrast, concedes the judges are its instrumentalities.

Our Court of Appeals' instruction in *Geness I* further supports our position the Commonwealth may be held liable for judicial conduct. In *Geness I*, our Court of Appeals held we erred in denying leave to file an amended complaint to add the Commonwealth as a defendant as futile. Our Court of Appeals held the "multiple, protracted, and inexcusable delays in the handling of Geness's examinations, transfers, and motions—resulting in nearly a decade of

imprisonment and civil commitment before a hearing was finally held on his habeas petition—are more than sufficient to state a claim under the ADA."[203] While we now know (based on evidence not available when we considered leave to amend three years ago) we could attribute much of the delay to Fayette County's District Attorney Heneks and Public Defender Whiteko, the record before our Court of Appeals showed responsibility for ordering Mr. Geness's examinations, ordering his transfers, and ruling on his motions fell squarely on the Court of Common Pleas judges. Our Court of Appeals identified the judges as one of the participants in the systemic failures.  We cannot hold our Court of Appeals would preclude liability upon the Commonwealth for this conduct.

Our interpretation of *Geness I* draws support from our Court of Appeals' reliance in *Geness I* on *Jackson v. Indiana*.[204] In *Jackson*, an Indiana Criminal Court judge ordered a defendant be committed "until sane" when evidence suggested he would never become sane.[205] The Supreme Court ruled this indefinite commitment violated the defendant's due process rights.[206] Neither the Supreme Court in *Jackson* nor our Court of Appeals in *Geness I* took issue with the defendant suing the State of Indiana for the conduct of its judges. We agree with Mr. Geness and will not disturb our earlier ruling.

### B.    We deny Mr. Geness's motion for summary judgment as the fact-finder must evaluate credibility and decide deliberate indifference.

Although we find Mr. Geness established the Commonwealth violated Title II based on the one service relating to competency restoration including Judge Wagner's Order committing Mr. Geness to Long Term Structured Release in spite of Dr. Chaudhary's determination Mr. Geness would never be competent to stand trial, we deny him judgment as a matter of law as to whether the Commonwealth, through its judges, exhibited deliberate indifference to Mr. Geness's rights.[207]  This decision requires fact finding and evaluating credibility.

As discussed above, Mr. Geness established "he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability."[208] But to establish his claim for compensatory damages, Mr. Geness "must also show intentional discrimination under a deliberate indifference standard."[209] To satisfy the deliberate indifference standard, Mr. Geness must establish the judges: (1) knew "that a federally protected right is substantially likely to be violated" and (2) "fail[ed] to act despite that knowledge."[210] "Deliberate indifference requires *actual knowledge*."[211] Mr. Geness cannot satisfy the deliberate indifference standard by showing the judges "would have" or "should have known" his rights were substantially likely to be violated.[212] "Deliberate indifference must be a deliberate choice, rather than negligence or bureaucratic inaction."[213]

Mr. Geness argues we can find deliberate indifference as a matter of law because the facts in this case are largely undisputed.  But while the facts may not be in dispute, "a case is not suitable for summary judgment when there are undisputed facts from which different inferences might be drawn and as to which reasonable minds might differ."[214] Reasonable minds could draw different inferences as to the issue of deliberate indifference on the evidence presented. While Mr. Geness paints a picture of judges who stood idly by as he languished in prison and, later, in an institution, the record depicts a more complex situation where Public Defender Whiteko forgot about his client from 2007 to 2010, District Attorney Heneks failed to respond to discovery requests from 2012 to 2014, Attorney Tummons failed to move to compel discovery until 2015, and the DHS refused to comply with numerous court orders to have Mr. Geness transferred to a mental health facility for evaluation. Regarding Judge Wagner's Order

committing Mr. Geness to Long Term Structured Release, reasonable minds could differ as to whether Judge Wagner exhibited deliberate indifference.

When the medical professionals from Torrance determined Mr. Geness would likely never become competent, Judge Wagner ordered Mr. Geness committed to Long Term Structured Release through Chestnut Ridge Counseling Services, Inc., "to be returned to the Fayette County Jail upon completion of his therapeutic program or a determination that he is competent to stand trial, whichever comes first."[215] As discussed *supra*, under *Geness I* this act violated Mr. Geness's rights under Title II of the Americans with Disabilities Act and the Fourteenth Amendment.  But without evidence of Judge Wagner's state of mind, we cannot find as a matter of law he acted with deliberate indifference.

Judge Wagner's Order provided two alternative scenarios under which Mr. Geness be "returned to Fayette County Jail": (1) upon completion of a therapeutic program; or (2) a determination that he is competent to stand trial.[216] A reasonable juror could determine Judge Wagner believed he was sentencing Mr. Geness to a temporary stay at Chestnut Ridge Counseling Services to complete a program, which would prepare Mr. Geness for his eventual release and allow him to receive critical services while his lawyers determined where Mr. Geness would go. Chestnut Ridge Counseling Services' website advertises its purpose is to "allow[] you to transition back into the community with the support and skills necessary to be successful in your recovery journey."[217] The adduced evidence establishes Mr. Geness is unable to live on his own, and a "release" would necessarily involve transitioning him to a facility for disabled or mentally ill adults. As Mr. Geness had neither family nor an appointed guardian when Judge Wagner entered his order, either the Commonwealth or Mr. Geness's counsel would need to make arrangements for this transition and would potentially need to initiate civil commitment

31

proceedings. A reasonable juror could find Judge Wagner sought to ensure Mr. Geness received appropriate mental health services while his attorney and the Commonwealth attorneys determined next steps.[218] But a reasonable juror could alternatively determine Judge Wagner knew the effect of his Order of potentially indefinite involuntary commitment violated the Fourteenth Amendment. Simply put, at this stage, we have no evidence of Judge Wagner's state of mind.  We cannot find deliberate indifference as a matter of law.

## III.    Conclusion

We grant the Commonwealth's motion for summary judgment on claims arising from DHS's role in housing Mr. Geness in suitable facilities. We grant the Commonwealth's motion to the extent liability is predicated on the conduct of the AOPC, but we deny the Commonwealth's motion for summary judgment to the extent liability is predicated on the deliberate indifference of the Court of Common Pleas judges.  While we find the Commonwealth violated Title II of the Americans with Disabilities Act and the Fourteenth Amendment as a matter of law when, after receiving a determination Mr. Geness would never become competent, Judge Wagner committed him to Long Term Structured Release for an indefinite period of time, we find reasonable minds could differ as to whether this order and subsequent conduct up to the December 2015 dismissal of criminal charges exhibited deliberate indifference to Mr. Geness's rights.

---

[1] Unlike our earlier review of pleadings, we today have the benefit of a fulsome record supporting cross-motions for summary judgment. Mr. Geness's counsel dismissed Fayette County without explanation, released the Commonwealth as to its liability for the conduct of its Department of Human Services in exchange for a fair settlement, and our Court of Appeals held the Administrative Office of Pennsylvania Courts cannot be directly liable. He now continues his claims against the Commonwealth.

Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of a motion for summary judgment. Each party prepared an appendix in support of their

cross-motions for summary judgment. The Commonwealth filed a statement of undisputed facts at ECF Doc, No. 261 and an appendix at ECF Doc. No. 262. Mr. Geness filed an *errata* statement of undisputed facts at ECF Doc. No. 272 and an *errata* appendix at ECF Doc. No. 273. Mr. Geness also filed a counterstatement of Material Facts at ECF Doc. No. 280 and an appendix to his counterstatement of facts at ECF Doc. No. 281.The Commonwealth filed an *errata* response to Mr. Geness's statement of undisputed facts at ECF Doc. No. 299 and an appendix to the response to Mr. Geness's statement of material facts at ECF Doc. No. 300.  References to the appendices are by ECF document number and the corresponding Bates number, for example, "1a."

[2] ECF Doc. No. 262 at 309a.

[3] *Id.* at 288a.

[4] *Id.* at 2a.

[5] *Id.* at 3a.

[6] ECF Doc. No. 273-1 at 496a, 498a.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] ECF Doc. No. 262 at 8a.

[11] *Id.*

[12] *Id.*

[13] *Id.* at 14a.

[14] *Id.*

[15] *Id.*

[16] *Id.* at 300a-301a.

[17] *Id.*

[18] *Id.* at 15a.

[19] *Id.*

[20] ECF Doc. No. 273-1 at 495a.

[21] *Id.* at 496a-497a.

[22] *Id.* at 497a.

[23] *Id.*

[24] *Id.* at 498a.

[25] *Id.*

[26] *Id.* at 303a.

[27] ECF Doc. No. 262 at 15a.

[28] The Fayette County Rules of Criminal Procedure contain little detail regarding the Call of the Criminal Trial List procedures, and thus, we glean our understanding from the transcripts of the proceedings.  *See generally*, ECF Doc. No. 273-1, Ex. 7B.

[29] *See generally*, *Id.*, Ex. 7a; *see e.g.,* 1191a.

[30] *See generally*, *Id.* Ex. 7b.

[31] *See, e.g.*, *id.* at 1078a ("What pages do the cases start on? . . . They start at Case Number Thirty, Your Honor, on page three.  The extraneous matters are all before that.")

[32] While it is not entirely clear from the record, it appears these transcripts are excerpts.

[33] ECF Doc. No. 262 at 15a-16a.

[34] ECF Doc. No. 273 at 1104a.

[35] *Id.*

[36] ECF Doc. No. 262 at 16a.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.* at 16a.

[41] *Id.*

[42] *Id.* at 304a.

[43] *Id.* at 306a.

[44] *Id.*

[45] *Id.* at 305a.

[46] *Id.* at 304a.

[47] *Id.*

[48] *Id.* at 306a-307a.

[49] *Id.*

[50] *Id.*

[51] *Id.* at 17a.

[52] *Id.*

[53] *Id.*

[54] ECF Doc. No. 273-1 at 552a.

[55] ECF Doc. No. 262 at 285a.

[56] *Id.* at 287a.

[57] *Id.* at 298a.

[58] *Id.* at 273a. Clinton Anderson then served as a Mental Health Program Manager for the Fayette County Behavioral Health Administration. *Id.* at 290a.

[59] *Crossroads-Term Structured Release*, Chestnut Ridge Services, Inc., https://www.crcsi.org/services/ltsr/ (last visited Nov. 29, 2020). We take judicial notice of this website as a matter of public record. *Hena v. Vandegrift*, No, 18-762, 2020 WL 1158640, at *25 (W.D. Pa. Mar. 10, 2020).

[60] ECF Doc. No. 292  at 314a, 338a.

[61] ECF Doc. No. 273 at 1128a-29a.

[62] *Id.* at 1130a-31a.

[63] *Id.* at 1134a-35a.

[64] *Id.* at 1129a, 1131a, 1135a,

[65] ECF Doc. No. 292 at 185a.

[66] *Id.* at 187a.

[67] *Id.* at 186a.

[68] *Id.* at 18a.

[69] *Id.* at 196a.

[70] *Id.*

[71] *Id.* at 191a, 196a.

[72] *Id.* at 191a.

[73] ECF Doc. No. 281-1 at 1282.

[74] *Id.* at 1283a.

[75] ECF Doc. No. 262 at 19a.

[76] *Id.*

[77] *Id.*  at 21a.

[78] ECF Doc. No. 281-1 at 1284a.

[79] ECF Doc. No. 273 at 1154a-55a.

[80] *Id.* at 1155a.

[81] *Id.* at 1228a-29a.

[82] *Id.* at 1179a-80a.

[83] *Id.* at 1180a.

[84] *Id.* at 1229a.

[85] *Id.* at 1191a.

[86] *Id.* at 1192a.

[87] *Id.*

[88] *Id.* at 506a.

[89] *Id.* at 513a, 515a, 516a.

[90] *Id.* at 524a.

[91] *Id.*

[92] *Id.*

[93] *Id.* at 524a-25a.

[94] *Id.* at 525a.

[95] *Id.* at 529-30.

[96] *Id.* at 518a.

[97] *Id.*

[98] *Id.* at 528a.

[99] *Id.*

[100] *Id.* at 535a.

[101] *Id.* at 536a.

[102] *Id.*

[103] ECF Doc. No. 273-1 at 537a.

[104] *Id.*

[105] *Id.*

[106] *Id.* at 511a.

[107] *Id.*

[108] ECF Doc. No. 262 at 22a.

[109] ECF Doc. No. 273 at 1267a-68a.

[110] ECF Doc. No. 262 at 326a.

[111] *Id.* at 329a-331a.

[112] *Id.* at 327a.

[113] *Id* at 328a.

[114] *Id.*

[115] *Id.* at 331a, 337a.

---

[116] *Id.* at 336a, 339a.

[117] ECF Doc. No. 273 at 1269a-70a.

[118] ECF Doc. No. 262 at 24a.

[119] *Id.*

[120] *Id.* at 23a.

[121] ECF Doc. No. 1.

[122] 42 U.S.C. § 12131 *et seq.*

[123] ECF Doc. No. 1.

[124] ECF Doc. No. 15.

[125] ECF Doc. No. 30.

[126] ECF Doc. No. 36.

[127] ECF Doc. No. 33.  Mr. Geness's counsel voluntarily dismissed Fayette County although both parties now advise it is the entity responsible for the prosecutors and public defender. As Mr. Geness's counsel never sought our approval of dismissing a party arguably in the center of this tragedy, we do not know whether counsel somehow released the County or if the County paid for its release. Mr. Geness now has the benefit of an experienced guardian *ad litem* for purposes of this case and we query whether this voluntary dismissal served Mr. Geness's interests as his counsel admitted Mr. Geness could not evaluate the fairness of dismissing the DHS and we wonder how he could evaluate the fairness of voluntarily dismissing Fayette County.

[128] ECF Doc. No. 64.

[129] ECF Doc. No. 99.

[130] ECF Doc. No. 74.

[131] ECF Doc. No. 76.

[132] ECF Doc. Nos. 92, 93.

[133] ECF Doc. No. 93 at 7-8.

[134] ECF Doc. No. 100.

[135] ECF Doc. Nos. 110, 111.

[136] ECF Doc. Nos. 113, 115.

[137] 902 F.3d 344 (3d Cir. 2018) ("*Geness I*").

[138] *Id.* at  349, 355.

[139] *Id* at 360.

[140] *Id.* at 365.

[141] *Id.* at 362 (quoting *Haberle v. Troxell*, 885 F.3d 170, 178-79 (3d Cir. 2018)).

[142] *Id.*

[143] *Id.*

[144] *Id.*

[145] *Id.*  at 363.

[146]  974 F.3d 263 (3d Cir. 2020) ("*Geness II*").

[147] ECF Doc. No. 121. Mr. Geness later withdrew his claims against the judges of the Court of Common Pleas of Fayette County and one claim against the Administrative Office of Pennsylvania Courts.  ECF Doc. No. 150.  We wonder how Mr. Geness could have fairly evaluated his counsel's decision to dismiss the judges when his counsel later admitted Mr. Geness could not fairly evaluate the fairness in dismissing the DHS.

[148] ECF Doc. No. 183.

[149] ECF Doc. No. 188.

[150] ECF Doc. No. 198.

[151] *Id.* at 7-8.

[152] 546 U.S. 151 (2006).

[153] *Geness II*, 974 F.3d  at 273-78, n.9.

[154] *Id.* at 274.

[155] *Id.* at 275.

[156] *Id.* at 276.

[157] *Id.*

[158] *Id.*

[159] *Id.*

[160] *Id.* at 278.

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] Pet. For Rehearing, *Geness II*, No. 19-2253, ECF Doc. No. 68 (3d Cir. Sept. 22, 2020).

[165] Order, *Geness II*, No. 19-2253, ECF Doc. No. 79 (3d Cir. Oct. 29, 2020).

[166] ECF Doc. No. 333.

[167] ECF Doc. No. 326.

[168] *Id.*

[169] ECF Doc. No. 329.

[170] ECF Doc. No. 260.

[171] ECF Doc. No. 335 at 2.

[172] ECF Doc. No. 264.

[173] ECF Doc. No. 334.

[174] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.,* 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey,* 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for

discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

[175] ECF Doc. No. 335 at 2.

[176] "Plaintiff and Defendant Department of Human Services ("DHS") have entered into a settlement of the claims raised against DHS in Count II of Plaintiff's Second Amended Complaint. The claims set forth in Count II of the Second Amended Complaint, are therefore, no longer an issue in this case. Therefore, to the extent that the Commonwealth was named as a party in Count II, the Commonwealth's liability for issues raised in that Count is extinguished." ECF Doc. No. 263 at 1 n.1

[177] *See, e.g., Blythe v. Del. Cnty. Bd. of Prison Inspectors*, No. 16-4673, 2018 WL 1620980, at *2 (E.D.Pa. Apr. 4, 2018) (granting summary judgment where plaintiff concedes it is appropriate as to certain defendants).

[178] *Geness I*, 902 F. 3d at 361-62.

[179] *Geness II*, 974 F.3d at 278.

[180] During oral argument, Mr. Geness's counsel argued his theory of liability against the Commonwealth is a direct theory, not a *respondeat superior* or a vicarious liability theory. But when asked to explain why we should hold the Commonwealth liable, he said the Commonwealth admitted the judges are its instrumentalities and the judges violated Mr. Geness's rights. This, by definition, is a vicarious liability theory. *Simmons v. Simpson House, Inc.*, 224 F. Supp. 3d 406, 413 (E.D. Pa. 2016) ("Vicarious liability 'is a policy-based allocation of risk' that holds one party liable for the actions of another due to a pre-existing relationship between the two parties." (quoting *Crowell v. City of Phila.*, 613 A.2d 1178, 1181 (Pa. 1992))).

[181] *Geness II*, 974 F.3d at 273.

[182] *Id.* at 274 n.9 (citing *United States v. Georgia*, 546 U.S. 151, 159 (2006)).

[183] *Id.* (internal citations and quotation marks omitted).

[184] ECF Doc. No. 299 ¶¶ 1-2.

[185] *Geness II*, 974 F.3d at 273.

[186] *Geness I*, 902 F.3d at 361-62.

[187] *Id.*

[188] *Id.* at 363-64.

[189] ECF Doc. No. 259-60.

[190] *City and Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1773-74 (2015) ("[T]he parties agree that [a public] entity can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees . . . [b]ut we have never decided whether that is correct, and we decline to do so here, in the absence of adversarial briefing.")

[191] *Waters v. Amtrak*, 456 F. Supp. 3d 666, 671 (E.D. Pa. 2020) ("When a public entity like Amtrak is sued under Title II, the entity is vicariously liable for the acts of its employees."); *Sharrow v. Bailey*, 910 F. Supp. 187 (M.D. Pa. 1995) (denying motion to dismiss vicarious liability Americans with Disabilities Act claim against a hospital based on the conduct of a physician).

[192] *Gunyup v. Lancaster Cnty.*, No. 06-4315, 2008 WL 4771852, at *1 (E.D.Pa. Oct. 29, 2008); *see also Zimmerman v. Berdanier*, No. 07-818, 2008 WL 11503557, at *6 n.10 (M.D. Pa. Jan. 25, 2008) ("Only public entities, rather than individuals, may be liable for violations of Title II of the ADA.")

[193] *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) ("When a plaintiff brings a direct suit under . . . Title II of the ADA against a municipality (including a county), the public entity is liable for the vicarious acts of its employees).

[194] *Delano–Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574–75 (5th Cir.2002) (holding "when a plaintiff asserts a cause of action against an employer-municipality, under either the ADA or the RA, the public entity is liable for the vicarious acts of any of its employees"); *Casas v. City of El Paso*, 502 F. Supp. 2d 542, 552 (W.D. Tex. 2007) ("A plaintiff, however, need not show that the intentional discrimination was the result of an official policy or attributable to a policymaker. . . Rather, a public entity is vicariously liable for the discriminatory acts of its agents.")

[195] 524 U.S. 274, 290 (1998). *See e.g.*, *Ravenna v. Village of Skokie*, 388 F Supp. 3d 999, 1008 (N.D. Ill. 2019) ("For these reasons, the Court holds that in order to succeed on her Title II claim Ravenna must prove, in accordance with *Gebser*, that a Skokie 'official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on [Skokie's] behalf ha[d] actual knowledge of discrimination in [Skokie's] programs and fail[ed] to adequately respond." (quoting *Gebser.*, 524 U.S. at 290)).

[196] *Gebser*, 524 U.S. at 277.

[197] *Id.* at 276.

[198] ECF Doc. No. 146 at 13.

[199] *Gebser*, 524 U.S. at 290.

[200] ECF Doc. No. 198 at 7-10.

[201] *Pub. Int. Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997).

---

[202] *Geness II*, 974 F.3d at 274 n.12.

[203] *Geness I*, 902 F. 3d at 362.

[204] *Id.* at 363-64 (discussing *Jackson v. Indiana*, 406 U.S. 725 (1972)).

[205] 406 U.S. at 725.

[206] *Id.* at 731.

[207] During oral argument, the Commonwealth argued the Commonwealth as an entity cannot have the scienter required for deliberate indifference. The Commonwealth did not cite  authority for this proposition, and our research indicates a state may be held liable for the deliberate indifference of its judges. *See, e.g.*, *Reed v. Ill.*, 119 F. Supp. 3d 879 (N.D. Ill. 2015) (dismissing judges as defendants but allowing the Americans with Disabilities Act claim against the state of Illinois to go forward where the complaint adequately pleaded deliberate indifference of state judges).

[208] *See supra*, Part III.A.2.i; *see also Furgess v. Pa. Dep't of Corrs.*, 933 F.3d 285, 288-89 (3d Cir. 2019).

[209] *Furgess*, 933 F.3d at 289.

[210] *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 266 (3d Cir. 2013).

[211] *Id.* at 266 n.26 (emphasis in original).

[212] *Id.*

[213] *Chambers v. School Dist. of Phila. Bd. of Educ.*, 537 Fed. App'x 90, 96 (3d Cir. 2013) (quoting *Durrell*, 729 F.3d at 263).

[214] *People's United Equip. Fin. Corp. v. Napcon, Inc.*, No. 11-0771, 2013 WL 1856654, at *3 (M.D. Pa. 2013) (quoting *Moore's Federal Rules Pamphlet* 2013 § 56.8[2].)).

[215] ECF Doc. No. 262 at 95a.

[216] *Id.*

[217] *Crossroads-Term Structured Release*, Chestnut Ridge Services, Inc., https://www.crcsi.org/services/ltsr/ (last visited Nov. 29, 2020).

[218] The adduced evidence may support this inference regarding Judge Wagner's state of mind. For example, during a monthly call of the list on August 26, 2013, almost two years after Judge Wagner ordered Mr. Geness to Long Term Structured Release, Judge Wagner learned the county incarcerated a different incompetent defendant at the Fayette County Jail awaiting trial. Judge Wagner said the jail was "the worst place" the defendant "could be right now." ECF Doc. No.

273-8 at 1191a. Judge Wagner then asked the attorneys, "[s]o why aren't we at least getting him to Torrance, and then work out whatever you want to work out?" *Id*. When the attorneys explained there was a hold up at the Attorney General's office, Judge Wagner replied, "[b]ut he shouldn't be over here where he gets no services whatsoever" and continued "why can't we simply do an order and have him transferred to Torrance, and whatever you and the AG what to do after that I could care less . . ." *Id.* at 1192a.